UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RAYMOND P. MACCAUSLAND, ) Individually and on Behalf of all Persons ) Similarly Situated, ) *Plaintiff*, ) ) v. ) ) UBER TECHNOLOGIES, INC., ) TRAVIS KALANICK, and ) GARRETT CAMP, ) *Defendants*. ) | Civil Action No. 1:17-cv-10253 |

## COMPLAINT AND DEMAND FOR JURY TRIAL

### Nature of Action

1.      This is a class action for monetary damages brought by the plaintiff, Raymond P. MacCausland ("MacCausland"), who holds a Hackney Carriage Driver's License ("Hackney License") and who works as a taxi shift driver in the City of Boston, both individually and on behalf of all other persons similarly situated (collectively, the "Plaintiffs") against the defendants Uber Technologies, Inc. ("Uber"), Travis Kalanick ("Mr. Kalanick"), and Garrett Camp ("Mr. Camp") (collectively "Uber Technologies" or the "Defendants"), for unfair and deceptive trade practices, anticompetitive business practices, interference with advantageous business relations, and civil conspiracy.

2.      Over the last eight decades, the Commonwealth of Massachusetts and the City of Boston have enacted laws and ordinances that promote consumer protection, public safety and non-discriminatory services in the provision of private transportation services, including transportation for hire or "ride-hailing" services.

3.      In or around 2010, Mr. Kalanick and Mr. Camp founded Uber. Mr. Kalanick is the President and Chief Executive Officer of Uber. Mr. Camp is a Director of Uber.

4.      Uber Technologies has created a transportation service that willfully violates those laws, regulations and rules to generate higher profits, to monopolize the "ride-hailing" industry in the City of Boston, and to gain an unfair competitive advantage over  and restrain the Plaintiffs, who at all times have conducted their business in the "ride-hailing" industry and earned their income lawfully.

In furtherance of its attempts to gain an unfair competitive advantage over, monopolize, and restrain competition, Uber Technologies illegally operated in the "ride-hailing" industry in the City of Boston and enacted a predatory anti-competitive pricing scheme to undercut and eliminate its competition, the taxi drivers operating in the City of Boston. While the Plaintiffs' fares are fixed by the government, Uber Technologies can lower its prices to any level. As set forth below, Uber Technologies has continuously done so to very low anti-competitive amounts. Uber Technologies has been utilizing this unfair disparity in pricing power to monopolize the industry and unlawfully restrain the Plaintiffs from operating in the "ride-hailing" market in the City of Boston.

## Subject Matter Jurisdiction

5.      Pursuant to 28 U.S.C. § 1332(d), the United States District Court for the District of Massachusetts has jurisdiction to hear this matter based upon a grant of diversity jurisdiction particular to class action suits by the United States Congress in the Class Action Fairness Act of 2005.

6.      This matter is a civil action filed pursuant to Fed. R. Civ. P. 23 and G.L. c. 93A, § 11, ¶ 3, which authorizes class action suits, G.L. c. 93 §§ 4, 5 and 12, and Massachusetts common law.

7.    As is detailed below, the amount in controversy exceeds the sum of $5,000,000.00 and the members of the Plaintiffs' class exceed 100 in number.

8.    As is detailed below, (a) MacCausland, the Plaintiffs' class representative, is a citizen of the Commonwealth of Massachusetts; (b) Uber is a corporation organized under the laws of the State of Delaware with a principal place of business in the State of California; (c) Mr. Kalanick is a resident of the State of California; (d) Mr. Camp is a resident of the State of California and (e) as such, a member of the Plaintiffs' class is a citizen of a state different from that of the Defendants.

9.    Because the Defendants are not a citizens of the Commonwealth of Massachusetts, the exceptions to the grant of diversity jurisdiction set forth in 28 U.S.C. § 1332(d)(4) are inapplicable.

**Personal Jurisdiction**

10.    At all times relevant and material, Uber, Mr. Kalanik, and Mr. Camp have operated a transportation-for-hire or "ride-hailing service" business in the City of Boston and other municipalities of the Commonwealth of Massachusetts consisting of Uber black cars, SUVs, taxis, and unlicensed personal vehicles owned by individual drivers and offered through a cut-rate anti-competitive service that Uber advertises as "UberX."

11.    As such, Uber, Mr. Kalanik, and Mr. Camp have purposefully availed themselves of the benefits and protections of the laws of the Commonwealth of Massachusetts within the meaning of G.L. c. 223A, §§ 3(a) and (b), and in a manner consistent with the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States of America by (a) transacting business within the Commonwealth of Massachusetts through their aforesaid

3

transportation-for-hire business or "ride-hailing" service and (b) contracting to provide services relating thereto within the Commonwealth of Massachusetts.

12.     Additionally, for reasons described *infra*, Uber, Mr. Kalanick, and Mr. Camp are subject to suit within the Commonwealth of Massachusetts both pursuant to G.L. c. 223A, § 3(c) and in a matter consistent with the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States of America because each have caused tortious injury to the Plaintiffs within the Commonwealth of Massachusetts.

13.     Furthermore, and in the alternative, Uber, Mr. Kalanick, and Mr.Camp are subject to general personal jurisdiction within the Commonwealth of Massachusetts within the meaning of G.L. c. 223A, § 3(d) by regularly engaging in persistent courses of conduct in the Commonwealth of Massachusetts through their aforesaid transportation-for-hire business or "ride-hailing" service.

## Venue

14.     Pursuant to 28 U.S.C. §§ 101 and 1391(b)(2), venue is proper in the United States District Court for the District of Massachusetts, as the Commonwealth of Massachusetts constitutes one judicial district, and a substantial part of the events or omissions giving rise to the claim occurred in the District of Massachusetts.

## Class

15.     The Plaintiffs' class consists of taxi shift drivers who hold Hackney Licenses and who rent licensed taxis with medallions from the owners of the 1,825 medallions that are required to operate a taxi in the City of Boston. Upon information and belief, there are at least 1,239 taxi drivers in the City of Boston who rent from taxi medallion owners.

16.    In the City of Boston, most medallion owners collect rent from shift drivers who earn income operating the medallion owner's vehicle. Medallion owners also rent the medallion itself to a driver who owns and operates his own vehicle for profit.

17.    For these reasons, the Plaintiffs' class represents the majority of taxi drivers in the City of Boston.

18.    As is detailed herein, MacCausland, as a taxi shift driver with a Hackney License, may bring this action on behalf of all of the Plaintiffs' class members because the class is so numerous that joinder of all members is impracticable; there are questions of law or fact common to the class; the claims of the representative parties are typical of the claims or defenses of the class; and the representative parties will fairly and adequately protect the interests of the class.

19.    As is detailed herein, prosecuting separate actions by individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications and would substantially impair their ability to protect their interests.

20.    As is detailed herein, Uber Technologies has acted in a matter that is harmful and which applies generally to the class such that final relief is appropriate respecting the class as a whole.

21.    As is detailed herein, questions of law and fact common to the class members predominate over any questions affecting only individual members.

22.    As is detailed herein, a class action is superior to other available methods for fairly and efficiently adjudicating the controversy in light of the class members' interests in a common action instead of individually controlling the prosecution or defense of separate actions; the absence of litigation concerning the controversy already begun by class members; the desirability

of concentrating the litigation of the claims in the United States District Court for the District of Massachusetts; and the relative ease of managing a class action as to this particular controversy.

## Parties

23.     MacCausland, the Plaintiffs' class representative, is a natural person who resides at 296 Weston Street, Waltham, Middlesex County, Massachusetts.

24.     The defendant, Uber Technologies, Inc., is a corporation organized under the laws of the State of Delaware which has a principal place of business at 1455 Market Street, 4th Floor, San Francisco, California.

25.     The defendant, Travis Kalanick, is a natural person who resides within the State of California  and who maintains a principal place of business located at 1455 Market Street, 4th Floor, San Francisco, California.

26.     The defendant, Garrett Camp, is a natural person who resides within the State of California  and who maintains a principal place of business located  at 1455 Market Street, 4th Floor,  San Francisco, California.

## Factual Allegations

### *Taxi Regulation in Boston*

27.     The taxi industry in the City of Boston is highly regulated by state statutes, city rules and ordinances, and agreements that specify how medallion owners, radio associations, taxi drivers and credit card processers must operate together which are designed to protect consumers and ensure that taxi services in Boston will operate both safely and reliably.

28.     The Massachusetts General Court has given the City of Boston and to the Boston Police Department's (the "BPDs") Police Commissioner (the "Commissioner") authority to regulate all vehicles "used or designed to be used for the conveyance of persons for hire from place

to place within the city of Boston." <u>See</u> G.L. c. 40, § 22; G.L. c. 159, Massachusetts Session Laws of 1930, Chapter 392 and the Session Laws of 1963, Chapter 386.

29.     Pursuant to the aforesaid legislative acts, the Commissioner enacted Rule 403, known as the Hackney Carriage Rules and Flat Rate Handbook, which applies to all vehicles "used or designed to be used for the conveyance of persons for hire from place to place within the city of Boston." <u>See</u> Hackney Carriage Rules and Flat Rate Handbook," Boston Police Department Rule 403.1.I.a.

30.     The Taxi Rules explicitly state that they are intended to be a "comprehensive and definitive listing of all regulations affecting the Hackney Carriage industry in the City of Boston . . ." <u>See</u> Taxi Rules, Section 1(II)(c).

31.     The current version of Rule 403 is the product of decades of revisions, designed to protect consumers, ensure public safety, safeguard competition, and provide nondiscriminatory taxi services to all areas of the City of Boston and to the elderly and disabled.

32.     The City of Boston's taxi regulations use three fundamental methods of ensuring that Boston taxi service is safe, reliable, and non-discriminatory:

a.      First, a taxi cannot operate legally in the City of Boston without one of 1825 city-issued taxi medallions which must be used on vehicles that meet strict requirements as to the vehicle's age, condition, and installed equipment, such as computerized dispatch machines, taximeters and approved credit card machines.

b.      Second, every taxi must be a member of one of seven approved "radio associations," that must (i) operate a single, GPS-enhanced radio dispatch service for members of that association; (ii) create and require members to adopt the same distinctive city approved cab colors and trade names for all cabs in that Association; and (iii) operate from a Boston business address, with a registered telephone number and registered agent for the radio association.

c.      Third, every taxi driver in the City of Boston must have a Hackney License and comply with extensive rules of conduct promulgated by the City of Boston, which includes requirements for dealing with handicapped passengers, allowed fares and charges, anti-discrimination requirements, and prohibitions on cell phone use.

*Uber*

33.    Uber is a transportation service that owns no taxis and which offers four types of conveyance-for-hire or "ride-hailing" vehicles to Boston travelers – Uber Black Cars, Uber SUVs, Uber Taxis and UberX, a cut-rate, unlicensed taxi service.

34.    Uber Technologies' transportation system communicates with customers through a free smart phone application (the "App").

35.    The Uber Technologies App gives consumers in the City of Boston a number of choices as to the form of private transportation:

a.    an "SUV" that seats up to six passengers;

b.    a "black car" that seats up to four passengers;

c.    a conventional Boston-licensed taxi that seats three to four passengers; and

d.    an UberX car, that seats three to four passengers.

36.    To use Uber Technologies' services, a customer user opens the App, which displays a map of the user's location, or a designated pickup point, displays the available black cars, SUVs, taxis and UberX cars in the neighborhood, and states how long the user will have to wait for each type of car.

37.    Depending on how much the customer wants to spend and how many cars in each price range are nearby, the user then chooses the type of vehicle they want.

38.    Uber Technologies' out-of-state computer system then selects an Uber-affiliated car, displays the driver's name and photograph on the customer's smart phone, and sends a text message to the user with the driver's projected arrival time and cell phone number.

***Uber's Unlawful Approach to Competition***

39.    Uber Technologies' means and methods of conducting its business contain no provisions to observe the aforesaid statutes, rules and ordinances which regulate the operation of taxis in the City of Boston, and although Uber Technologies has actual knowledge that it has violated these laws and it continues to do so to gain an unfair advantage over taxi shift drivers with Hackney Licenses that operate within the limits of the law.

40.    Although the City of Boston requires that all "conveyance[s] of persons for hire" or "ride-hailing" services that are dispatched, hailed, or available at taxi stands must have taxi licenses, and notwithstanding that the City of Boston has issued 1825 license medallions in furtherance of the goals of consumer protection, public safety, lawful competition, and nondiscriminatory services, Uber Technologies disregarded and continues to disregard such rules and their underlying public policies by signing up an unregulated and unaccountable number of UberX vehicles, black cars and SUVs and linking them to customers in direct competition with taxis and in violation of the City of Boston's Taxi Rules.

41.    Uber Technologies' business model is not a *bona fide* effort to compete and to modernize the taxi industry; rather, it utilizes an anti-competitive and predatory business and pricing model that plays to the disadvantage of taxi shift drivers with Hackney Licenses, who operate taxis lawfully within the City of Boston. The anti-competitive pricing model has been implemented to monopolize the ride-hailing service in the City of Boston and restrict trade and commerce in violation of state and federal law. Uber Technologies' goal has been to severely undercut the taxi drivers with its predatory pricing until it has driven taxi drivers with Hackney Licenses out of the "ride-hailing" industry in the City of Boston. Rather than merely providing a competitive alternative, Uber Technologies is aimed at removing the taxi drivers altogether as

competition so it can monopolize the industry and then charge any price it desires for "ride-hailing" services within the City of Boston.

### *Uber's Illegal Operation of UberX Vehicles, Black Cars and SUVs*

42.    Uber Technologies means and methods of conducting its business operate to undermine the protections consumers receive under the Boston Taxi Rules.

43.    When it began operation in the City of Boston in 2011, Uber Technologies urged its customers to use Uber-affiliated black cars and SUVs, rather than taxis:

> Our classic black car option is the default. Choose this and either a high-end sedan or SUV will be curbside in minutes.

> (https://www.uber.com/cities/boston)

44.    By early 2013, Uber Technologies was promoting UberX, "the Low Cost Uber," which is a cut-rate version of Uber Black Cars and SUVs, as the economical substitute for all other Uber Technologies vehicles.

45.    Uber Technologies' promotional material in early 2013 told every owner of a Toyota Prius, Toyota Camry, Nissan Altima, Ford Taurus or Ford Fusion of model years 2006 or later with a Massachusetts driver's license, not a Hackney License, and an insurance policy that they can become an Uber Technologies vehicle driver simply by demonstrating "city knowledge and professionalism" and completing a one-hour "on-boarding session."

46.    Uber Technologies promoted that car owners could be corporations, LLCs, or even a d/b/a, an individual "Doing Business As" any company name he or she might choose.

47.    Uber Technologies promotion contained no provisions for:

a.    equipment to meet the standards set forth in the Taxi Rules;

b.    drivers to pass any of the criminal record and driving record standards for Boston taxi drivers; or

c.      compliance with the Taxi Rules that protect riders and neighborhoods against discrimination.

48.     Because UberX-affiliated cars are assigned by a set of computers with no real-time connection to the Boston Police Department and which have no ability to respond to public safety emergencies, they can charge lower rates than legal, medallioned taxis and can therefore supplant taxis in the wealthiest and most heavily traveled areas of the City of Boston and leave shift drivers of licensed taxis to serve less lucrative segments of the market.

49.     On August 5, 2016, Governor Charlie Baker signed into law a bill directing the Commonwealth of Massachusetts Department of Public Utilities to establish a statewide regulatory framework for transportation network companies ("TNCs"), which includes Uber, but the damage to the Plaintiffs has already been done.

### The Harm of Uber's Illegal Operation to Hackney License Holders

50.     Uber Technologies' marketing approach was designed to convince consumers to see Uber Technologies' "black" cars, which include SUVs and limousine-style vehicles, as down-market limousines and to view UberX vehicles as the inexpensive alternative to Uber Technologies black cars and Uber taxis.

51.     However, Uber Technologies-affiliated vehicles are, *de facto*, "hackney carriages" under the City of Boston's regulations and cannot operate legally without a medallion and Hackney Licensed driver.

52.     All Uber Technologies-affiliated vehicles, whether they are categorized as UberX, black cars, SUVs or taxis, are hailed from the App, assigned to customers through the same Uber Technologies computer system, and have fares determined by Uber Technologies' metering device. Essentially, all Uber Technologies has done is replace the traditional hand raising on the street with the App, both of which secure the same "ride-hailing" service.

11

53.    For that reason, all Uber Technologies-affiliated vehicles function as taxis; in fact, Uber Technologies has told taxi regulators in the City of New York that the Uber Technologies system is a "virtual hail" and the equivalent to standing on a street corner and flagging a taxi.

54.    The Vehicle for Hire Ordinance in the City of Boston Code 16-15:05(a) states:

> In the City of Boston, no person, firm, or corporation driving or having charge of a taxicab or other private vehicle shall offer the vehicle for hire for the purpose of transporting, soliciting and/or picking up a passenger or passengers unless said person is licensed as a hackney driver and said vehicle is licensed as a hackney carriage by the Police Commissioner of said City.

(City of Boston Code 16-15.05: Vehicle for Hire Ordinance) (Appendix I to TaxiRules).

55.    Because no UberX or black car or SUV hailed electronically by an Uber Technologies customer in the City of Boston has a medallion, all Uber black car, SUV and UberX services in the City of Boston have been and are currently operating illegally, without drivers with Hackney Licenses, and to the detriment of taxi shift drivers with Hackney Licenses.

56.    According to data compiled by the City of Boston Police Department's Hackney Carriage Unit, total taxi fare revenues have declined consistently over the last four fiscal years, ending September 30, from (a) $210.40M in 2013; to (b) $198.20M in 2014; to (c) $150.20M in 2015; and to (d) $126.90M in 2016, resulting in significant financial harm to the Plaintiffs

(https://www.bostonglobe.com/business/2017/01/31/cabbies-say-end-near-uber-lyft-come-logan/ZvsYuFKjQnQlLlBzbB4RAK/story.html)

57.    As such, since 2013, the decline in total taxi fares totals $155.9M, and as Uber Technologies expands its operations, the downward trend is continuing, resulting in significant financial harm to the Plaintiffs.

58.    The expenses and regulations that Hackney License holders face make it impossible to compete with Uber Technologies, which simply disregards the City of Boston's Vehicle for

Hire Ordinance, and Hackney License holders who typically made $700 to $800 in profits each week now find themselves lucky to make $200 per week.

(http://www.bostonglobe.com/business/2015/08/19/boston-taxi-ridership-down-percent-this-year/S9dZMELMye6puzTTYoDIrL/story.html)

59.    According to Uber's Chief Executive Officer, Mr. Kalanick, Uber Technologies' goal is to eliminate the legal taxi industry by disregarding laws regulating vehicles for hire and using an anti-competitive pricing model, which is made clear in the following statements:

   a.    "We're in a political campaign, and the candidate is Uber, and the opponent **is an a\*\*hole named taxi**."  (The Daily Beast, June 30, 2014)

   b.    We were in a campaign where the candidate is Uber and the incumbent is an a\*\*hole called 'taxi.'"  (Mashable, May 28, 2014)

   c.    "Stand by your principles and be comfortable with **confrontation**. So few people are, so when the people with the red tape come, it becomes a negotiation."  (The Wall Street Journal, January 25, 2013)

   d.    "As an entrepreneur, I try to **push the limits**. Pedal to the metal." (The Washingtonian, January 11, 2012)

   e.    "I like the book. Do you have a problem with that? … I just think it's a great story of somebody who stood up for what they believe in."  (New Republic, April 29, 2013, commenting on Ayn Rand's "Fountainhead," a novel that emphasizes **self-interest and individual beliefs**, even if it means **violating society's rules and norms**)

60.    Additionally, as per Matt Kochman, who served as Uber's founding general manager in New York and who left to do consulting for transportation brands and startups, "Discounting the rules and regulations as a whole, just because you want to launch a product and you have a certain vision for things, that's just irresponsible."  (New York Magazine, December 6, 2013)

61.    Notwithstanding the Vehicle for Hire Ordinance in the City of Boston, Code 16-15:05(a), Uber Technologies encourages its affiliated drivers to disregard the aforesaid ordinance by indemnifying them for any citations incurred in connection therewith.

62.    Specifically, Uber Technologies has engaged in a practice of reimbursing the drivers of Uber Technologies-affiliated vehicles for citations issued for violations of City of Boston Code 16-15:05(a).

63.    In a prepared statement to BostInno, a local online news site and community publishing platform, Uber Technologies stated:

> Uber vigorously defends the rights of our partner drivers in Boston, firmly stands by them when they are wrongly cited, and has paid unjust citations.

(http://bostinno.streetwise.co/2014/05/30/boston-uberx-drivers-500-police-tickets-reimbursed/)

### *Uber's Market Effect Upon Public Safety*

64.    The City of Boston's Taxi rules protect the public from dangerous taxi drivers by requiring Hackney License applicants to meet seventeen criteria before they can even apply for a license, including that they:

a.    be twenty-one years of age or older;

b.    pass a standard examination demonstrating the ability to speak, read, write and understand the English Language;

c.    participate in Hackney Carriage testing and training as determined by the Inspector of Carriages;

d.    have an original Birth Certificate, Alien Card, Asylum Document, United States Passport or Naturalization Papers;

e.    not have a Hackney Carriage Driver's License that is revoked or suspended in any jurisdiction;

f.    have a valid Massachusetts Driver's License;

g.    have had a Driver's license in the United States for at least two years;

h.    not have been adjudged a Habitual Traffic Offender, as defined by G.L. c. 90, § 22F, or the equivalent in any jurisdiction, within the past five years;

i.    not have any outstanding or unresolved driving infractions which could result in the applicant's Driver's license being suspended or revoked in any jurisdiction;

j.    not have had his or her Driver's License suspended for five or more Surchargeable Incidents, as defined by 211 CMR 134, or the equivalent in any jurisdiction, within the past five years;

k.    not have more than four violations of the Traffic Laws and/or At-Fault Accidents as defined by 211 CMR 134 or an equivalent department in the last three years (violations and accidents occurring on the same date will count as only one) in any jurisdiction;

l.    not have any Operating Under the Influence of drugs or alcohol convictions or dispositions under G.L. c. 90 § 24D within the past five years or the equivalent in any jurisdiction;

m.    not have any felony convictions within the last five years in any jurisdiction;

n.    not have any drug convictions in the last five years in any jurisdiction;

o.    not have any dispositions for a criminal offense, in any jurisdiction, that would result in the denial of a license, including admissions to sufficient facts or continuance of an offense without resolution, unless the circumstances of such incident are reviewed by the Inspector of Carriages as to the specific facts and circumstances and the applicant is thus approved by the Inspector of Carriages;

p.    not be required to register as a sex offender in any jurisdiction; and

q.    not have any outstanding or unresolved criminal court cases in any jurisdiction which could result in the license being denied if the Applicant was convicted of the alleged offense.

See Hackney Carriage Driver Standards, Taxi Rules Appendix I.

65.    In contrast, according to Uber Technologies, anyone can drive an Uber Technologies-affiliated UberX car, black car or SUV in the City of Boston as long he or she has a conventional driver's license and insurance; in fact, Uber Technologies' complete description of the standards it applies in selecting drivers is that:

> We carefully select the fleet partners we work with and ensure that they have proper licensing and insurance.
>
> (http://support.uber.com/entries/22346733-how-does-uber-select-drivers.)

66.    Uber Technologies then reassures customers that, despite Uber Technologies' relaxed standard for selecting drivers, it takes steps to weed out unsuitable drivers:

> We've also implemented a customer generated rating system for drivers. If a driver's rating goes beneath a certain level, we will no longer do business with them. We're careful to maintain a standard of only doing business with quality, licensed drivers.
>
> (http://support.uber.com/entries/22346733-how-does-uber-select-drivers.)

67.    In reality, Uber Technologies quality control method for its drivers consists of a five-star rating system by which its riders rate their drivers immediately after the ride.

68.    Additionally, notwithstanding Uber Technologies' assurance that if a driver dips below a certain star rating, Uber Technologies will "no longer do business with" that driver, Uber Technologies does not tell its customers that every driver receives an automatic initial five star rating just for signing up with Uber Technologies.

69.    Additionally, every Uber Technologies customer must execute a waiver as a prerequisite to registration which states, in pertinent part, as follows:

> The company may introduce you to third party transportation providers for the purposes of providing transportation. We will not assess the suitability, legality, or ability of any third party transportation providers and you expressly waive and release the company from any and all liability, claims, or damages arising from or in any way related to the third party transportation provider. The company will not be a party to disputes, negotiations of disputes, between you and such third party providers. We cannot and will not play any role in managing payments between you and the third party providers. Responsibility for the decisions you make regarding the services offered via the application or service (with all its implications) rest solely with you. We will not assess the sustainability, legality or ability of any such third parties and you expressly waive and release the company from any and all liability, claims, causes of action, or damages arising from your use of the application or service, or in any way related to the third parties introduced to you by the application or service. You expressly waive and release any and all rights or benefits under Section 1542 of the Civil Code of the State of California (or any analogous law of any state), which reads as follows: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the with the debtor."
>
> The quality of the transportation services scheduled through the use of the service or application is entirely the responsibility of the third party provider who ultimately provides such transportation services to you. You understand, therefore, that by using the application and the service, you may be exposed to transportation

16

that is potentially dangerous, offensive, harmful to minors, unsafe, or otherwise objectionable, and that you use the application and the service at your own risk.

(https://www.uber.com/legal/terms#)

70.     By comparison, the City of Boston Taxi Rules require all drivers to hold a Hackney License, which, in addition to being granted only to applicants who meet Rule 403's standards for testing, training, criminal record, driving record, drug use and sex offender status, also subjects Hackney License holders to an extensive set of rules that includes requirements such as:

a.     not to possess alcohol or permit open alcohol containers in their vehicles;

b.     not to talk on a cell phone;

c.     not to smoke or to permit smoking; and

d.     not to discriminate against potential customers based on race, sex, religion, disability, sexual orientation, national origin, pickup location or destination or intoxication.

See Rule 403, Section 5.II.

71.     These rules are enforced by the Inspector of Carriages, who can conduct hearings on complaints and suspend or revoke a license.

72.     Uber Technologies, in contrast, does not require black car and SUV drivers in the City of Boston to have anything more than a conventional driver's license and insurance, and automatically grants all Uber Technologies-affiliated drivers an initial and automatic five star rating.

### *Uber Discriminates Against Disabled, Elderly and Less Wealthy Riders*

73.     Boston's Taxi Rules contain an Anti-Discrimination Clause which states, in pertinent part, that:

A Hackney Carriage Driver may not refuse any passenger on the basis of race, sex, religion, disability, sexual orientation, national origin, or location of the passenger's pick-up or destination in any circumstance.

See Taxi Rules, Section 5.2.

74.     Uber Technologies-affiliated drivers, however, can ignore this requirement without any adverse consequences, thereby forcing customers in less secure neighborhoods to use conventional taxis, and forcing taxi shift drivers with Hackney Licenses to bear the full burden of complying with the Anti-Discrimination Clause.

75.     Additionally, City of Boston taxi drivers are required to accept multiple forms of payment, including cash, credit cards, vouchers and Boston Taxi Industry Elderly Program (BTIEP) coupons, which allow customers who are elderly, handicapped, disabled or suffer from cancer to pay discounted rates.  See Taxi Rules, Section 9.II.b; Taxi Rules, Section 7.l.

76.     In contrast, Uber Technologies-affiliated drivers cannot accept cash, coupons or vouchers; all payments are charged automatically to the customer's preauthorized credit card, and Uber Technologies drivers are discouraged from accepting tips.

77.     Uber Technologies' credit-card only payment system discriminates against lower-income individuals without credit cards and discriminates unlawfully against elderly, handicapped, disabled and cancer patients who, who have the legal right to use BTIEP coupons to pay for taxi trips.

***Uber's Deceptive Fares and Representations to Customers***

78.     The City of Boston's taxi rules protect consumers – and less wealthy customers – by establishing uniform fares.

79.     Under those rules, charges for trips within the City of Boston and to nearby suburbs ("Meter Rate Communities") must be displayed on a city-inspected and sealed Taximeter that calculates the fare based on time and distance, and trips to more distant towns are set by the Flat Rate Handbook.  See Taxi Rules, Section 5.II.k, Section 10.II.c.

18

80.    In contrast, Uber Technologies-affiliated UberX, black cars and SUV's charge a flat rate plus additional charges per-mile or per-minute, depending on the car's speed, notwithstanding the City of Boston's policy in favor of uniform, non-discriminatory charges for taxi service. Uber Technologies can charge any price it desires, and raise and lower the prices to any level at any time.

81.    In times of high demand, Uber Technologies imposes "surge pricing," a multiplier of its base fare structure, which places Uber Technologies-affiliated vehicles at an unfair advantage as compared to shift drivers of medallioned taxis with Hackney Licenses, which cannot charge more than the rates prescribed by the Taxi Rules.

82.    Uber Technologies showcases the luxury of its black cars and SUVs, but these vehicles lack essential protections required by the Taxi Rules for all dispatched-on-demand transportation services in the City of Boston, such as:

a.    Protective Partitions: The Taxi Rules require all Boston cabs to have a protective barrier of metal and lexan between the front and back seats.  See Rule 403, Section 3.III.c.iii.  These barriers not only protect drivers from assault and theft; they also prevent drunk or drugged passengers from interfering with the driver and causing accidents. In contrast, Uber's marketing plays up the six-person capacity of its SUVs, encouraging a party atmosphere and increasing the risk that boisterous passengers will distract the driver – or worse.  Uber black cars and SUVs have no partitions, putting drivers at risk and undermining a critical public safety program of the City of Boston.

b.    GPS Tracking and Panic Buttons: Every Boston taxi must be equipped with an Inspector-approved GPS system that gives the Boston Police internet access, both in real time and for a year after any trip, to the location of every cab, the pick-up and drop-off points, how the passenger paid, and the exact route followed.  Every cab must also be equipped with a panic button that automatically sends the dispatcher an emergency signal and the location of the cab.  Uber black cars and SUVs have no such approved equipment.  Uber does not disclose what data it preserves on black car and SUV trips, and any such data is not accessible to the Boston Police.  In an emergency, Uber black car and SUV drivers cannot hit a panic button:  rather, they have to phone for help.

c.    Taximeters and Flat Rates: The fare for every Boston taxi trip is set by an inspected and sealed Taximeter or the Flat Rate Handbook, ensuring that every customer pays

the same rate. Uber black cars and SUVs make no attempt to comply with these legally-mandated maximum rates. Fares are set by Uber's proprietary algorithm, which always charges more than the Boston taxi rate. Uber's user agreement also allows it to use "surge" pricing when demand becomes "intense." Uber took advantage of this contractually-permitted price gouging to hike prices 625% early on New Year's Day 2012.

(http://blog.uber.com/2012/01/01/take-a-walk-through-surge-pricing/)

### *Uber's Anti-Competitive and Unfair and Deceptive Conduct*

83.    Although Uber Technologies justifies its disregard of the Taxi Rules under a theory that Uber Technologies-affiliated black cars and SUVs are livery cars, livery cars provide prearranged transportation and not "ride-hailing" services.

84.    Uber Technologies' computerized service, however, allows for immediate assignments and "virtual hails" of Uber Technologies-affiliated cars driving in a customer's neighborhood, which puts Uber Technologies-affiliated black cars and SUVs in direct competition with taxi drivers with Hackney Licenses, whether dispatched, hailed, or parked at a taxi stand.

85.    In fact, the Commonwealth Automobile Reinsurers Commercial Automobile Insurance Manual defines car service vehicles as:

[A]n unmarked for hire auto with a seating capacity of 8 or less which:

(1)    is hired on a prearranged basis;

(2)    does not pick up hail fares on the street;

(3)    does not contain a rate meter, and does not charge for services based upon miles traveled if the trip is less than twenty-five miles;

(4)    operates on a scheduled business day, and is returned to the vehicle's base of operation for a continuous period of at least four hours in each twenty-four hour period;

(5)    is operated by the named insured, an employee, or an independent contractor of the named insured, in attendance as a chauffeur;

(6)    operates from a base with two-way communication;

(7)    primary payment method is by billing or credit card.

See Commonwealth Automobile Reinsurers Commercial Automobile Insurance Manual, Section V – Public Transportation, § 73.D.2.c.

86.    With regard to UberX-affiliated vehicles, Uber Technologies does not claim that they are livery vehicles, yet Uber asserts, without a basis in fact or law, that they are simply not subject to regulation in the City of Boston.

87.    However, the Commonwealth Automobile Reinsurers Commercial Automobile Insurance Manual defines taxis as "a metered or unmetered motor vehicle with a seating capacity of eight or less that is operated for hire by or on behalf of the named insured or by an employee, but does not pick up, transport, or discharge passengers along a route."  See Commonwealth Automobile Reinsurers Commercial Automobile Insurance Manual, Section V – Public Transportation, § 73.D.2.a.

88.    When UberX began in Boston in or around 2013, Uber Technologies engaged in a scheme to intentionally undercut the taxi industry with a predatory pricing plan to monopolize the ride-hailing industry, restrain trade and commerce, and ultimately drive the taxi drivers out of business.

89.    In 2013, Uber Technologies in Boston charged prices higher than taxicab rates but lower than UberBlack rates. Uber Technologies promoted UberX as costing 40% lower than UberBlack. The base rate cost for an UberX ride was set at $5.00 in the City of Boston. (http://bostinno.streetwise.co/2013/02/25/uberx-uber-car-service-launches-uberx-in-boston/)

90.    As demand for UberX increased between early 2013 and October 2013, Uber Technologies began offering the UberX service for free:



(https://newsroom.uber.com/us-massachusetts/bosfreeuberxweek/)

91.     As demand increased further, due to the significant price reductions and free ride offerings, Uber Technologies implemented the second phase of its pricing scheme by lowering the UberX base rate in the City of Boston to $2.50, now promoting that the UberX rides were "30% cheaper than a taxi.":

☰ **UBER** Newsroom

October 15, 2013   |   Posted by Annika        f    🐦    in    8+    ⤴

We are thrilled to announce new rates that make uberX more affordable than ever…

> ### uberX is now 30% cheaper than a taxi!

**WHAT ARE THE NEW RATES?**
With new rates, the average uberX trip is now 30% cheaper than a taxi. Click here to share the great news with friends!

|  | OLD RATES | NEW RATES |
|---|---|---|
| Base Fare | $5.00 | **$2.50** |
| Per Minute (Below 11 MPH) | $0.60 | **$0.40** |
| Per Mile (Above 11 MPH) | $2.60 | **$2.05** |
| Minimum Fare | $10.00 | **$4.00** |

**≡ UBER** Newsroom

**SAMPLE FARES**

| | NEW uberX RATES | OLD uberX RATES | TAXI |
|---|---|---|---|
| Back Bay to Downtown | $8 | $10 | $11 |
| Logan Airport to Financial District | $18 | $24 | $27 |
| Cambridge to South End | $12 | $17 | $19 |

So enjoy, Boston: uberX is now an even more cost-effective ride – 24 hours a day, all over the Greater Boston Area.

Ride on,
Team Uber Boston

(https://newsroom.uber.com/us-massachusetts/new-uberx-prices-now-30-cheaper-than-a-taxi/)

92.     Upon information and belief, at the same time Uber Technologies was lowering its UberX rates as set forth above, it reduced the commission its drivers owed for each ride to supplement the driver income loss from the price reductions.

93.     Upon information and belief, Uber Technologies lost money on each and every UberX ride in its attempt to monopolize the industry and restrain taxi drivers from operating.

94.     Uber Technologies continued to lower its non-competitive pricing structure in January 2014 by 15-34% in various cities, including the City of Boston, declaring:



(https://newsroom.uber.com/situation/)

95.     Uber Technologies publicized its drastic undercutting of the prices charged by the taxicab industry in the City of Boston with this graphic on its website:



(https://newsroom.uber.com/us-massachusetts/uberx-in-boston-just-got-even-cheaper/)

96.      In the above graphic, Uber Technologies states, **"These fares may only last a limited time, but the more you ride, the more likely they will last"**. In other words, the anti-

competitive predatory pricing model will remain in effect so long as it is helping achieve the monopoly and restrain taxi drivers, then prices will go up.

97.     It is apparent from Uber Technologies' public statements and its "all in" predatory pricing scheme, that it was not intending on providing a competitive market alternative. Uber was intent on destroying any and all competition through drastic anti-competitive pricing that it could only sustain as a result of the government-fixed fares for taxi drivers together with  significant venture capital support to sustain the huge yearly losses.

98.     In the City of Boston in June 2014, Uber continued its predatory scheme by introducing another 25% price reduction, making it approximately half the price of a taxi.

99.     Upon information and belief, Uber Technologies was actually paying its drivers more than Uber was charging riders under this pricing scheme.

100.    Under this pricing scheme, Uber Technologies deflated the UberX fares to below cost in order to drive out the taxi drivers and then recoup the loses once Uber Technologies competitor, taxi drivers, were out of business.

101.    Upon information and belief, Uber Technologies pricing scheme drove its pricing so low that Uber Technologies has lost approximately $2 billion dollars a year. Upon information and belief, that number is likely to rise to $3 billion dollars for 2016.

### *Uber Unfairly Competes By Deceiving Customers About UberX Insurance Coverage*

102.    When Uber Technologies launched UberX in the City Boston in 2013, it represented to Boston consumers in postings on the Uber Technologies website that UberX vehicles would be covered by insurance with $1 million limits, stipulated that UberX autos must meet strict model and model year standards, and required that they be registered as commercial vehicles.

103.    After competition from "ridesharing" services such as Lyft and Sidecar threatened UberX's market share, Uber Technologies relaxed its standards.

104.    Presently, Uber Technologies advertises that anyone is eligible to drive for UberX who is "[a]t least 23 years old, with a personal license and personal auto insurance," if their personal vehicle is "[a]ny mid-size or full-size 4-door vehicle, in excellent condition."

(https://partners.uber.com/signup/boston/)

105.    Uber Technologies currently informs its customers through a posting on its website dated March 14, 2014 that:

> From the time a driver accepts a trip request through our app until the completion of the ride, our partners have $1 million of coverage for driver liability. We were also the first ridesharing request service to include $1 million of coverage for uninsured/underinsured motorists, meaning that passengers and drivers are also covered for injuries when another party is at fault and lacks sufficient insurance. This $1 million coverage from trip acceptance to drop-off is consistent across cities. This coverage kicks in regardless of whether the driver's personal insurance applies to the trip.

(http://blog.uber.com/uberXridesharinginsurance).

106.    Uber Technologies' representation to its customers that it provides $1 million in liability coverage is deceptive in multiple ways.  The $1 million representation is deceptive, first, because the insurance policy Uber cites is, at best, excess coverage that only "kicks in" if the driver's coverage is inadequate or inapplicable.

(http://www.scribd.com/doc/214635531/Insurance-Policy).

107.    Second, the $1 million representation is deceptive because Uber's $1 million policy appears to limit coverage to "the amount of insurance . . . required by the contract or agreement you have entered into with the additional insured . . . ."

(http://www.scribd.com/doc/214635531/Insurance-Policy)(Endorsement JA5201US 09-12)

108.   Uber Technologies' agreements with UberX drivers in Massachusetts require the drivers to have Massachusetts Automobile Insurance policies, which currently require insured drivers to carry compulsory bodily injury insurance of $20,000 per person, $40,000 per occurrence, and compulsory property damage insurance of $5,000 per accident.

109.   The policy cited by Uber Technologies appears to limit its coverage to the amount of the Massachusetts Automobile Insurance coverage UberX drivers in Massachusetts are required to carry under their agreements with Uber Technologies.

110.   Accordingly, the Uber Technologies contracts do not require UberX drivers to carry more than the compulsory limits, as Endorsement JA5201US 09-12 appears to set limits of coverage at an amount equal to the UberX driver's Massachusetts coverage, not the $1 million Uber Technologies claims.

111.   Third, the $1 million representation is deceptive because it does not acknowledge that the insurers issuing personal insurance policies to Massachusetts UberX drivers can be expected to contest part or all of the bodily injury coverage in the event of a liability claim, either on grounds that the UberX driver misrepresented the use of the insured vehicle in obtaining coverage, or on the ground that optional coverage does not apply to use of the automobile as a "public or livery conveyance."

112.   Uber Technologies' representations that its policy "kicks in" regardless of the driver's insurance deceives UberX customers by downplaying the predictable delay, cost and inconvenience of determining whether the driver's personal insurance will apply.

113.   Uber Technologies' business and pricing model has positioned itself to control the entire private transportation system in the City of Boston to the detriment of both taxi drivers with

Hackney Licenses and to travelers in general by disregarding laws that forbid "surge pricing," unapproved cars and unlicensed drivers.

### *Uber Interfered with the Taxi Drivers' Business Relationships*

114.    When Uber Technologies began operating in the City of Boston in or around 2013, only taxi drivers with a medallion, or an agreement to lease a medallion, could lawfully operate as a ride-hailing service in the city. Therefore, in this regulated market, all individuals seeking ride-hailing services in the city were *de facto* prospective customers or clients of taxi drivers. As a result, the taxi drivers' prospective customers and clients are easily identifiable as no other entity was permitted under the law to provide them the service.

Uber Technologies, in violation of Massachusetts law, directly and improperly interfered with these prospective customers and clients when it began to illegally contract, through its online application or App, with these customers and clients in the City of Boston seeking ride-hailing services in the city.

### COUNT ONE
### (Unfair and Deceptive Trade Practices)

115.    The Plaintiffs repeat and restate all of the allegations contained in paragraphs one through one-hundred and fourteen above, as if expressly rewritten and set forth herein.

116.    Uber Technologies, through its officers, agents, servants and employees have engaged in a persistent course of conduct that disregards statutes, ordinances, rules and agreements that are designed to protect consumers, ensure public safety, safeguard competition, and provide nondiscriminatory taxi services to all areas of the City of Boston and to the elderly and disabled.

117.    Uber Technologies, through its officers, agents, servants and employees have engaged in a persistent course of conduct in trade and commerce that places travelers in and around the City of Boston at risk and that places Uber Technologies-affiliated drivers at an unfair

advantage over shift worker taxi drivers with Hackney Licenses, the latter of which are acting in conformity with the aforesaid statutes, ordinances, rules and agreements, and which have caused the latter to suffer a loss of money and property.

118.    Uber Technologies, as set forth above, engaged in anti-competitive conduct, including but not limited to a predatory pricing scheme, meant to monopolize and restrict the ride-hailing industry in the City of Boston.

119.    Uber Technologies' aforesaid conduct constitutes unfair and deceptive acts and practices in the conduct of trade or commerce in the Commonwealth of Massachusetts within the meaning of G.L. c. 93A, § 2.

120.    This is an action brought pursuant to G.L. c. 93A, § 11 by the Plaintiffs to recover the loss of money and property that has been caused by Uber Technologies' unfair and deceptive trade practices and unfair competition.

**WHEREFORE**, the Plaintiffs demand judgment against the Defendants for the above-described damages to the Plaintiffs, together with interest, costs and attorneys' fees, and for damages of up to three, but not less than two, times the amount of the award upon a finding that the Defendants committed unfair and deceptive acts and practices willfully and knowingly in violation of G.L. c. 93A, § 2.

### COUNT TWO
### (Common Law Unfair Competition)

121.    The Plaintiffs repeat and restate all of the allegations contained in paragraphs one through one hundred and twenty above, as if expressly rewritten and set forth herein.

122.    By unlawfully participating in the operation of Uber-affiliated taxi, black car, SUV and UberX transportation services without incurring the expense of compliance with

Massachusetts law and Boston ordinances, as alleged above, Uber Technologies unfairly competes with the Plaintiffs.

123.    Uber Technologies, as set forth above, engaged in anti-competitive conduct, including but not limited to a predatory pricing scheme, meant to monopolize, and restrict the ride-hailing industry in the City of Boston.

124.    Uber Technologies' unfair competition has caused harm to the Plaintiffs by diverting revenues that would otherwise be paid to taxi shift drivers with Hackney Carriage licenses.

**WHEREFORE**, the Plaintiffs demand judgment against the Defendants for the above-described damages to the Plaintiffs, together with interest and costs.

**COUNT THREE**
**(Interference with Advantageous Business Relationships)**

125.    The Plaintiffs repeat and restate all of the allegations contained in paragraphs one through one-hundred and twenty-four above, as if expressly rewritten and set forth herein.

126.    As is detailed above, the Plaintiffs had business relationships with clients and prospective customers seeking ride-hailing services for economic benefit.

127.    As is detailed above, Uber Technologies knew of the Plaintiffs' relationships with consumers of ride-hailing services and interfered with said relationships through improper motives and means, which interference directly resulted in the loss of the Plaintiffs' advantages in the aforesaid business relationships.

**WHEREFORE**, the Plaintiffs demand judgment against the Defendants for the above-described damages to the Plaintiffs, together with interest and costs.

## COUNT FOUR
**(Restraint of Trade or Commerce and Unfair Competition – G.L. 93, §§ 4 and 5)**

128.    The Plaintiffs repeat and restate all of the allegations contained in the paragraphs one through one hundred and twenty-seven above, as if expressly rewritten and set forth herein.

129.    The purpose of the anti-trust laws in Massachusetts is to preserve and advance a system of free and open competition and to secure to everyone an equal opportunity to engage in business, trade, commerce for the purpose of ensuring that the consuming public may receive better goods and services at lower cost.

130.    As detailed above, the Defendants' conduct, including but not limited to the predatory pricing scheme, restrained trade or commerce in the Commonwealth of Massachusetts in violation of G.L. c. 93 § 4.

131.    As detailed above, the Defendants conspired to restrain trade or commerce in the Commonwealth of Massachusetts in violation of G.L. c. 93 § 4.

132.    As detailed above, the Defendants' conduct, including but not limited to their predatory pricing scheme, monopolized trade or commerce in the Commonwealth of Massachusetts in violation of G.L. c. 93 § 5.

133.    As detailed above, the Defendants conspired to monopolize trade or commerce in the Commonwealth of Massachusetts in violation of G.L. c. 93 § 5.

134.    As a direct and proximate result of the Defendants' attempt to achieve monopoly power through anticompetitive conduct and restrain trade or commerce, Plaintiffs have suffered and continue to suffer damages in an amount to be proven at trial.

**WHEREFORE**, the Plaintiffs demands judgment against the Defendants for the above-described damages to the Plaintiffs, together with interest, costs and attorneys' fees, and for

damages of up to three times the amount of the award upon a finding that the Defendants violated G.L. c. 93 §§ 4 and/or 5.

## COUNT FIVE
### (Monopolization – Sherman Antitrust Act, 15 U.S.C. § 2)

135.    The Plaintiffs repeat and restate all the allegations contained in the paragraphs one through one hundred and thirty-four above, as if expressly rewritten and set forth herein.

136.    The purpose of the anti-trust laws in United States is to preserve and advance a system of free and open competition and to secure to everyone an equal opportunity to engage in business, trade, commerce for the purpose of ensuring that the consuming public may receive better goods and services at lower cost.

137.    The Sherman Antitrust Act prohibits anticompetitive conduct carried out for the purpose of achieving monopoly power in any part of interstate or foreign trade or commerce.

138.    As detailed above, the Defendants' conduct, including but not limited to their anti-competitive predatory pricing scheme, was carried out with the intent to monopolize the ride-hailing market in the City of Boston for the purpose of obstructing, restraining, and excluding the Plaintiffs.

139.    It is likely that the Defendants will obtain their goal of achieving monopoly power over the ride-hailing market in the City of Boston through the conduct described above, including its competition by anti-competitive pricing.

140.    The Defendants' anticompetitive conduct, as described above, violates the Sherman Antitrust Act, and the injuries caused by the Defendants' anticompetitive conduct are of the type intended to be prevented by the Sherman Antitrust Act.

141.    As a direct and proximate result of the Defendants' attempt to achieve monopoly power and obstruct, restrain, and exclude competition, the Plaintiffs have suffered and continue to suffer damages in an amount to be proven at trial.

**WHEREFORE**, the Plaintiffs demand judgment against the Defendants for the above-described damages to the Plaintiffs, together with interest, costs and attorneys' fees, and for damages of up to three times the amount of the award upon a finding that Uber Technologies violated the Sherman Antitrust Act.

**COUNT SIX**
**(Civil Conspiracy)**

142.    The Plaintiffs repeat and restate all the allegations contained in the paragraphs on through one-hundred and forty-one above, as if expressly rewritten and set forth herein.

143.    The defendants, Mr. Kalanick, Mr. Camp, and  Uber, together with the employees of Uber, knew that their conduct, as described above, constituted a breach of duty and each provided substantial and encouragement to the other in the assistance of such breach.

144.    The defendants, Mr. Kalanick, Mr. Camp, and Uber, together with the employees of Uber, engaged in a common plan to engage in unfair and deceptive acts and anti-competitive business practices, including the anti-competitive and predatory pricing plan, intended to monopolize and restrain the Plaintiffs from the ride-hailing industry in the City of Boston.

145.    The defendants, Mr. Kalanick, Mr. Camp, and Uber, together with the employees of Uber, were all aware of and knew of the plan and its purposes. Such knowledge is evidenced by the conduct described above, including but not limited to the public statements and internet postings made by the Defendants.

146.    The Defendants, Mr. Kalanick, Mr. Camp, and Uber, together with the employees of Uber, all took affirmative steps, as specifically set forth above, to achieve the anti-competitive conduct meant to monopolize and restrict the ride-hailing industry.

147.    As a direct and proximate result of the Defendants' conspiracy, the Plaintiffs have suffered and continue to suffer damages in an amount to be proven at trial.

**WHEREFORE**, the Plaintiffs demands judgment against Uber for the above-described damages to the Plaintiffs, together with interest, costs and attorneys' fees.

**THE PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES PROPERLY TRIABLE BY JURY.**

Respectfully submitted,
The Plaintiff, RAYMOND P. MACCAUSLAND,
Individually and on Behalf of all Persons Similarly Situated,
By his Attorneys,

**COLUCCI, COLUCCI, MARCUS & FLAVIN, P.C.**

*/s/ Darin M. Colucci*
Darin M. Colucci (BBO #563232)
*darin@coluccilaw.com*
424 Adams Street
Milton, MA  02186
Tel:  (617) 698-6000
Fax:  (617) 698-3001

Dated:  February 16, 2017